UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 3:22-CR-136-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| JACOB FITZMAURICE, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Jacob Fitzmaurice's Appeal of a decision by United States Magistrate Judge Colin H. Lindsay denying his Motion to Suppress Evidence in a misdemeanor case.  [*See* R. 2 (appealing R. 2-2)].  Defendant filed objections to the decision [*see* R. 2; R. 6], the United States responded [R. 9], and Defendant replied [R. 10].  The matter is ripe for review.  For the following reasons, the Court will deny Defendant's appeal, overrule his objections, and affirm the Magistrate Judge's denial of the Motion to Suppress Evidence.

I.      **Standard of Review**

The Court normally addresses a case's factual history before outlining the procedural posture and standard of review.  However, because this matter concerns the appeal of a Magistrate Judge's dispositive ruling, the Court will discuss the procedural background and legal standard first as they help frame the issues.

Defendant was arrested and charged with "operating a motor vehicle while under the influence of alcohol/drugs .08 (1st off) (aggravated circumstances)" under KRS 189A.010(5A), after he was stopped while entering Fort Knox.  [See R. 2-11]; *see also* 18 U.S.C. §§ 7, 13  (as assimilated by the Assimilative Crimes Act).  "This offense is a class B misdemeanor," *see United States v. Wallace*, No. CR 3:20-MJ-762, 2021 WL 3008274, at \*3 (W.D. Ky. July 15, 2021) (citing

KRS 189A.010(5)(a)), meaning the Magistrate Judge had jurisdiction in the first instance to oversee Defendant's criminal proceedings. *See* 18 U.S.C. § 3401(a) ("When specially designated to exercise such jurisdiction by the district court or courts he serves, any United States magistrate judge shall have jurisdiction to try persons accused of, and sentence persons convicted of, misdemeanors committed within that judicial district."); *see also* LCrR 5.1; General Order 2020-27 (entered December 8, 2020, and superseded by General Order 2022-06 (entered June 6, 2022)).

After Defendant was charged, he filed a Motion to Suppress Evidence. [R. 2-5]. The United States responded [R. 2-6], and the Magistrate Judge held an evidentiary hearing on the motion [R. 2-3]. After supplemental briefing by both sides [R. 2-7; R. 2-8], the Magistrate Judge entered a Memorandum Opinion and Order denying Defendant's motion. [R. 2-2]. Defendant then appealed to the undersigned. [*See* R. 2]. Defendant filed Objections and Amended Objections [R. 2; R. 6], the United States responded [R. 9], and Defendant replied [R. 10]. The matter now stands submitted.

The parties dispute the proper standard of review that applies to Defendant's appeal. [*See* R. 6, pp. 1-2; R. 9, pp. 1-2]. However, disappointingly, neither party cites Federal Rule of Criminal Procedure 58, which governs "Petty Offenses and Other Misdemeanors" and provides the controlling "scope of appeal" in this case. Under Rule 58, "[t]he defendant is not entitled to a trial de novo by a district judge. The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge."[1] *See* Fed. R. Crim. P. 58(g)(2)(D).

---

[1] Notably, a final judgment has not been entered in this case, as Defendant has not had a trial or pled guilty. Instead, he appealed immediately after the Magistrate Judge's denial of his motion to suppress. [*See* R. 2]. Based on the language of Rule 58, it appears Defendant's appeal is premature because motions to suppress are not generally immediately appealable. *See United States v. Choi*, 818 F. Supp. 2d 79, 85 (D.D.C. 2011) ("In a federal misdemeanor case, unlike in other settings, a district court judge does not refer the matter to a magistrate, and does not exercise blanket supervisory powers; to the contrary, the district court judge cannot intervene prior to a final judgment unless a court of appeals could so intervene."); *see also* Fed. R. Crim P. 58(g)(2)(A); *United States v. Boyd*, 948 F.2d 1290, *1 (6th Cir. 1991) (Table). The Court can deny

Relevant here, the Court of Appeals "review[s] for abuse of discretion the district court's decision to admit or exclude evidence, whether at a suppression hearing or other proceeding." *See United States v. Stepp*, 680 F.3d 651, 660 (6th Cir. 2012). Under this standard, the Court of Appeals "will leave rulings about admissibility of evidence undisturbed unless [it is] left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where it improperly applies the law or uses an erroneous legal standard." *Id.* (internal citations omitted).

Further, the Court of Appeals uses "a *de novo* standard for the district court's legal determinations[.]" *United States v. Shank*, 543 F.3d 309, 312 (6th Cir. 2008). And the Court of Appeals "will not set aside the district court's factual findings unless they are clearly erroneous." *Id.* "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). Where a motion to suppress has been denied, the Court of Appeals "review[s] all evidence in a light most favorable to the Government." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) (internal quotation marks omitted).

Accordingly, the Court will review the Magistrate Judge's evidentiary rulings for abuse of discretion, his factual findings for clear error, and his legal conclusions *de novo*.[2] *See Stepp*, 680

---

Defendant's appeal and affirm the Magistrate Judge's decision on this ground alone. *See Boyd*, 948 F.2d 1290, at *1. For the benefit of a full record, the Court will still address Defendant's present objections. [*See* R. 2; R. 6].

[2] One of Defendant's objections presents a mixed question of law and fact that will also be reviewed *de novo*. *See United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012) ("Whether reasonable suspicion of criminal activity has been adequately established to justify a traffic stop is a mixed question of law and fact that we review *de novo,* although we consider the district court's decision in the light most favorable to the party that prevailed in the court below.") (citations omitted).

F.3d at 660 (reviewing district court's evidentiary rulings at suppression hearing for abuse of discretion); *see also United States v. Tataw*, No. 5:13-CR-029-TBR, 2013 WL 6097109, at *2 n.6 (W.D. Ky. Nov. 20, 2013) (reviewing legal conclusions of magistrate judge denying a motion to suppress *de novo* and referencing standard of review for factual findings as clearly erroneous).

## II.    Background

The Magistrate Judge's Memorandum Opinion and Order denying Defendant's motion to suppress contained a thorough recitation of this case's factual history.  Restating those findings here provides a framework for the Court to address Defendant's objections:

> In the early hours of January 30, 2022, a motorist contacted the Radcliff Police Department ("Radcliff Police") to report a possible drunk driver.  (Suppression Hr'g Tr., at 9-10 [hereinafter "Supp. Hr'g Tr."].)  The 911 caller identified herself as Stephanie Brown ("Brown") and reported that she was traveling on Highway 313 toward Vine Grove, Kentucky behind a red Chevrolet Silverado that was "all over the road."  (Gov't Hr'g Ex. 3, at 00:00-01:04 [hereinafter "Radcliff PD Audio"].)[3] Brown relayed the real-time position of the red Silverado on Highway 313 to Radcliff Police as she followed it and reported that it had Virginia tags numbered "VZC1309."  (*Id.;* Supp. Hr'g Tr., at 10, 14; Gov't Hr'g Ex. 1.)  Dispatcher Klinglesmith with Radcliff Police then radioed Sergeant James Lark ("Sergeant Lark"), who was working the night shift as part of his regular duties, regarding a possible drunk driver on Highway 313.  (Supp. Hr'g Tr., at 10-11, 22; Radcliff PD Audio, at 01:05-01:37; Gov't Hr'g Ex. 1.)  Dispatcher Klinglesmith asked Brown to keep him informed of the red Silverado's position until Brown needed to turn off Highway 313.  He then stayed on the phone with Brown and periodically relayed pertinent information to Sergeant Lark.  (Radcliff PD Audio, at 01:38-04:36.) Brown reported that the red Silverado kept picking up speed and then slowing down and repeated her earlier description of the vehicle being "all over the road"; she continued to report both her own position and that of the red Silverado until she had to turn off Highway 313.  (*Id.*).
>
> After Brown hung up, Dispatcher Klinglesmith relayed the red Silverado's last known position to Sergeant Lark.  (*Id.* at 04:37-07:49.)  Sergeant Lark passed the red Silverado going the opposite direction on the highway.  (Supp. Hr'g Tr., at 10-11.)  Sergeant Lark observed that the vehicle was traveling at an excess rate of speed though he was not running radar to be able to state a specific speed.  (*Id.* at 25-26.)  Because the vehicle was headed toward Fort Knox and would reach the same before Sergeant Lark could catch up with it, Sergeant Lark asked Dispatcher

[3] The Court will refer to all audio recordings by the number of minutes and seconds that elapsed from the beginning of the cited recording. [Footnote in original.]

Klinglesmith to notify Fort Knox of the incoming potential drunk driver. (*Id.* at 10-11; Radcliff PD Audio, at 04:37-07:49.) Sergeant Lark testified that other than the excess rate of speed, he could not get to the red Silverado to observe anything else about the vehicle or how it was being driven. (Supp. Hr'g Tr., at 23-25; Radcliff PD Audio, at 09:01-09:38.) Dispatcher Klinglesmith proceeded to contact Fort Knox Emergency Services. (Radcliff PD Audio, at 07:50-09:00.) He reported that Radcliff Police had received a call about a possible driver under the influence who was headed toward post; he also relayed the make, model, and tag number of the suspect vehicle. (*Id.*; Supp. Hr'g Tr., at 22-23.)

Fort Knox 911 dispatcher Barbara VanBeverin ("VanBeverin") and her partner were working the night the call came in. (*Id.* at 28.) VanBeverin's partner took the call from Radcliff Police while VanBeverin dispatched law enforcement to the gate to investigate. (*Id.* at 29, 32-33, 37-38.) VanBeverin testified that a patrol unit was dispatched prior to Defendant Fitzmaurice ever arriving at the gate. (*Id.* at 31; Gov't Hr'g Ex. 3.) When dispatching, VanBeverin told officers that a possible DUI had been reported by Radcliff Police. (Gov't Hr'g Ex. 4.) VanBeverin testified that according to Fort Knox Emergency Services' records, Fitzmaurice arrived at the Chaffee Gate at Fort Knox at approximately 1:08:34 on January 30, 2022. (Gov't Hr'g Ex. 3; Supp. Hr'g Tr., at 39-40, 44-46.) Based on her review of those same records, she testified that approximately four minutes elapsed between when law enforcement was dispatched and when officers arrived on scene at the gate. (Govt' Hr'g Ex. 3; Supp. Hr'g Tr., at 40.)

Officer Curtis Stalcup ("Officer Stalcup"), a supervisory police officer with the Fort Knox Directorate of Emergency Services, answered the call from Fort Knox dispatch. (Supp. Hr'g Tr., at 50.) He testified that he was on the far side of the installation when the call came in and that it took him approximately four minutes to reach the gate. (*Id.* at 50, 58.) When Officer Stalcup arrived at the gate, the red Silverado was parked in a parking area thirty to fifty feet away from the gate and a Department of the Army Security Guard ("DASG") was standing at the rear of the vehicle checking the license plate; Fitzmaurice was in the driver's seat.[4] (*Id.* at 50-51, 54; Gov't Hr'g Ex. 5.) At various points, several vehicles were blocking Fitzmaurice in so he would not have been able to leave. (Supp. Hr'g Tr., at 59.) Officer Stalcup testified that while Fitzmaurice was not under arrest when he arrived on scene, Fitzmaurice was nonetheless "detained." (*Id.* at 60, 70.) Officer Stalcup spoke briefly with the DASG, who was running Fitzmaurice's license and plates, and observed that Fitzmaurice's vehicle matched the radio description. (*Id.* at 54-55.) Officer Stalcup asked Fitzmaurice to exit his vehicle and administered standard field sobriety tests including a horizontal gaze nystagmus test and a walk-and-turn test. (*Id.* at 54-55.) Officer Stalcup testified that during those tests Fitzmaurice "staggered around quite a bit," "had balance issues," gave all six

---

[4] Officer Stalcup testified that standard operating procedure would have been for anyone suspected of drunk driving to remain in the lane at the gate for safety, not to have that individual move his or her vehicle to the adjacent parking lot. (*Id.* at 51.) While that procedure was not followed in this case, the deviation has no bearing on the outcome of this case. [Footnote in original.]

existing indicators on the horizontal gaze test, and fell during the walk-and-turn test. (*Id.* at 55.) Officer Stalcup then asked for consent and—after Fitzmaurice consented—administered a portable breathalyzer test. (*Id.* at 55-56.) After Fitzmaurice failed, Officer Stalcup informed Fitzmaurice that he was "under apprehension" for operating a motor vehicle under the influence. (*Id.* at 57.) A citation was issued charging Fitzmaurice with violating KRS § l89A.010(5)(a). (Violation Notice No. KWl0-09816396.) Officer Stalcup testified that the entire stop took approximately twenty minutes, which was not excessive for a stop of this type in his experience. (Supp. Hr'g Tr., at 58.)

At no point did Officer Stalcup ever give Fitzmaurice *Miranda* warnings. (*Id.* at 74.) Officer Stalcup testified that there was some discussion during the stop of Fitzmaurice "not wanting to get in trouble" to which Officer Stalcup responded that the tests being administered were voluntary. (*Id.* at 68.) Fitzmaurice also stated that he was cold on several occasions. (*Id.* at 60, 68.) There was no other testimony during the hearing regarding any specific questions asked of Fitzmaurice or any other statements made by him during the stop.

[R. 2-2, pp. 1-4].

## III.   Defendant's Evidentiary Objection

Defendant first presents an evidentiary objection: "As a preliminary matter, Counsel for the Defense renews objection to the admission of . . . the audio recording of the Radcliff Police Department Computer Aided Dispatch (CAD)[] into the record." [R. 6, p. 2]. Defendant bases this objection on several grounds, including that "[t]he audio recording was not properly admitted per the rules of evidence, nor was it authenticated as a true, accurate, and complete record by the keeper of said records." [*Id.*].

The Court finds Defendant's arguments misplaced and oblique. To be sure, case law is clear that "[t]he Rules of Evidence are inapplicable . . . to the admission of evidence presented at suppression hearings." *See Stepp*, 680 F.3d at 668 (citing *United States v. Matlock*, 415 U.S. 164, 172-73 (1974)). And, by their own terms, the Federal Rules of Evidence do not apply to a decision regarding the admissibility of evidence. *See id.* (citing Federal Rules of Evidence 104(a) and 1101(d)(1)). Although Defendant cites a handful of cases regarding the admission of evidence *at*

- 6 -

trial [*see* R. 6, pp. 2-6], he does not acknowledge (in the nearly four pages of argument on his evidentiary objection) that the Rules of Evidence did not apply at his suppression hearing.

Failing to provide supporting authority is a continuing theme for Defendant's arguments on his evidentiary objection. For example, for many arguments, such as Defendant's claim that "[a]dmission of this audio recording violated the Defendant's Sixth Amendment right to confront witnesses against him," [*see id.* at 3], he offers no legal or factual support. These issues, which are only "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," will be "deemed waived." *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (internal quotation marks omitted). And for still other issues, case law directly refutes Defendant's assertions. For instance, Defendant maintains that "[t]he government did not offer an exception to admission of this hearsay evidence." [R. 6, p. 2]. But Sixth Circuit precedent states that, "[i]n a suppression hearing . . . hearsay evidence is admissible." *See United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979).

On this record, the Court finds that the Magistrate Judge did not abuse his discretion in admitting the audio recording. *See Stepp*, 680 F.3d at 669 ("At a suppression hearing, we would expect the district court to err on the side of considering more, not less, information[.]"); *see also id.* at 668 ("Even at a suppression hearing," the court's "findings must be supported by competent and credible evidence.") (internal quotation marks omitted). Therefore, the Court will deny Defendant's evidentiary objection. *See* LCrR 47.1(a) ("A motion must state with particularity the grounds for the motion, the relief sought, and the legal argument necessary to support it.").

## IV.   Defendant's Objections to the Magistrate Judge's Findings of Fact

Defendant next argues that "[c]areful review of the factual findings of the Memorandum Opinion and Order of the Magistrate Judge will lead to the conclusion that a mistake has been

committed." [*See* R. 6, p. 6]. Defendant primarily contends that the Magistrate Judge omitted certain facts from his Memorandum Opinion and Order.

Here, Defendant represents that: "[t]here are no specific statements to distinguish the driving behavior from a tired, inattentive or careless driver"; "[t]he Court's factual findings did not include the conclusions Sergeant Lark of the Radcliff Police Department made about his observations of the vehicle described by the motorist"; and that "the Court's factual findings also did not address that no testimony was obtained from the first two Department of the Army Security Guards (DASGs)[] who detained Fitzmaurice and requested he park his vehicle 100 feet past the entrance to the Chafee Gate" and that "[g]lossing over the fact that these two officers detained Fitzmaurice for four minutes without testimony or independent reasonable articulable suspicion is a true mistake." [*See id.* at 6-9].

Regarding Defendant's first factual objection, it is true that a different conclusion *could* have been drawn by those involved that Defendant was simply a careless driver rather than an impaired driver. However, the record shows that is *not* the conclusion they drew. Instead, the evidence demonstrates that Defendant was suspected of being an impaired driver.

Defendant's objection regarding the conclusions of Sergeant Lark is likewise misplaced. Although Defendant argues that the Magistrate Judge did not address Sergeant Lark's observations of Defendant, this assertion is refuted by the record. Indeed, the Magistrate Judge found: "Sergeant Lark testified that other than the excess rate of speed, he could not get to the red Silverado to observe anything else about the vehicle or how it was being driven." [*See* R. 2-2, p. 2]. Thus, contrary to what Defendant argues, the Magistrate Judge *did* acknowledge that Sergeant Lark testified that his observations of Defendant's driving were limited.

- 8 -

Finally, Defendant's objection regarding the purported failure of the Magistrate Judge to address "that no testimony was obtained from the first two Department of the Army Security Guards" is confounding. Defendant could have subpoenaed those guards to testify at this evidentiary hearing and chose not to.[5] *See* Fed. R. Crim. P. 17(a). That he did not do so is not an error of the Magistrate Judge. The Magistrate Judge discussed the testimony of others, including Officer Stalcup, as to the actions of the guards, and those findings are supported by the record.

Therefore, Defendant has failed to show that the Magistrate Judge's factual findings were clearly erroneous. *See Shank*, 543 F.3d at 312 ("A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed.") (internal quotation marks omitted). His objections to the Magistrate Judge's findings of fact will be overruled.

## V.    Defendant's Objections to the Magistrate Judge's Conclusions of Law

Defendant also objects to the Magistrate Judge's legal findings. The Fourth Amendment guides the Court's consideration here. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"). Through his motion, Defendant asked the Court to "[s]uppress for use at trial all evidence obtained by law enforcement in this case," "[d]ismiss with prejudice Charge One: 'OPERATE MV U/INFLU OF ALC/DRUGS/ETC. .08'" against him, and "[p]rovide any and all other relief as may be deemed necessary by the Court." [*See* R. 2-5, p. 6].

In denying Defendant's motion, the Magistrate Judge reached several conclusions: (1) the collective knowledge doctrine permitted law enforcement to rely on information gleaned from one

---

[5] Defendant also argues that "[t]he failure to preserve the video of these events is egregious, particularly after Fort Knox Dept. of Emergency Services policies changed regarding preservation." [R. 6, p. 9]. However, he provides no support for how the failure to preserve this video would result in different factual conclusions than those drawn by the Magistrate Judge.

another to support the stop of Defendant; (2) reasonable suspicion existed for the traffic stop; (3) the stop was not unreasonably extended; and (4) Defendant's *Miranda* rights were not violated. [*See* R. 2-2, pp. 5-18].  Defendant now objects on each of these grounds.  [R. 2, R. 6].  The Court will review the Magistrate Judge's legal conclusions *de novo*.  *See Shank*, 543 F.3d at 312.

*Collective Knowledge Doctrine*.  Defendant's first legal objection is based on the theory that the law enforcement officers involved could not rely on the information that had been collectively obtained to support stopping him.[6]   [*See* R. 6, p. 9].  Case law and the record demonstrate that this objection lacks merit.

"It is well-established that an officer may conduct a stop based on information obtained by fellow officers."   *Lyons*, 687 F.3d at 765-66.   Under the "collective knowledge" or "fellow officer" rule, courts "impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop."  *Id.* at 766.  "Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion."  *Id.*

In determining whether the collective knowledge doctrine applies, the Court must make three separate inquiries: "(1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it."  *See id.* at 767.  Within the context of this case, the Court considers

---

[6] Defendant seems to argue that Kentucky law should control the constitutional analysis.  [*See* R. 6, pp. 10, 12 n.2].  However, federal law most certainly controls a Fourth Amendment analysis.

the first and third questions in relation to Officer Stalcup, who ultimately arrested Defendant, and the second question in relation to Sergeant Lark.

The Magistrate Judge determined that the first and third inquiries were easily met. [*See* R. 2-2, p. 9]. Having independently reviewed the record and the controlling case law, the Court agrees. Regarding the first inquiry, the record supports a finding that Officer Stalcup acted objectively based on the information he had received. In other words, no evidence was presented to suggest that he acted for an impermissible purpose or that he attended to the stop of Defendant for any reason other than suspicion of Defendant being an impaired driver. Similarly, the third inquiry presents no constitutional concerns in this case because Officer Stalcup simply responded and conducted the appropriate tests for an individual suspected of driving under the influence.

The Magistrate Judge found the second inquiry proved a closer call, but ultimately determined that Sergeant Lark had reasonable suspicion that Defendant could be stopped for criminal activity. [*Id.* at 13]. The Court once again agrees with the Magistrate Judge.

"The reasonableness of a traffic stop is measured by the same standards set forth for investigatory stops in" *Terry v. Ohio*, 392 U.S. 1 (1968)). *See Lyons*, 687 F.3d at 763. Importantly,

> [r]easonable suspicion requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop.

*Id.* This is not a high standard, and the Court finds that it was met by Sergeant Lark in this case. *See Navarette v. California*, 572 U.S. 393, 395 (2014) (holding a traffic stop made "[a]fter a 911 caller reported that a vehicle had run her off the road . . . . complied with the Fourth Amendment because, under the totality of the circumstances, the officer had reasonable suspicion that the driver was intoxicated").

Within this context, the Court makes several observations.  First, Stephanie Brown, and the person riding with her ("Nathan") were not anonymous tipsters, which increases the reliability of the information they provided to the dispatcher.  *See United States v. Williams*, 483 F. App'x 21, 25-26 (6th Cir. 2012).  Further, Brown told the dispatcher she observed a red Silverado truck that was all over the road and the direction the truck was heading, and Sergeant Lark saw a truck matching that description heading in a direction consistent with Fort Knox traveling at a high rate of speed.  *See id.* at 25 ("Tips that provide specific details or predictions of future action fall higher on the reliability scale because they suggest the existence of knowledge to which the public might not have access.").

Second, the behavior that Brown described, namely that Defendant was "all over the road," is consistent with drunk driving.[7]  *See Navarette*, 572 U.S. at 402 (describing "weaving all over the roadway" as "sound indicia of drunk driving").  Thus, Defendant's argument that his behavior merely constituted a careless driving violation is unavailing.  *See id.* at 403 ("It is true that the reported behavior might also be explained by, for example, a driver responding to an unruly child or other distraction. But we have consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct.") (internal citations and quotation marks omitted).

Third, although Defendant argues to the contrary, the collective knowledge doctrine applies to information shared between federal and state officers.  *See, e.g.*, *Lyons*, 687 F.3d at 767 ("As

---

[7] Defendant argues that Sergeant Lark lacked reasonable suspicion to stop Defendant because he did not know what speed Defendant was driving.  [*See* R. 6, pp. 13-14].  Here, Defendant maintains that "[t]he question is not whether Sergeant Lark had 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,' but whether or not he had enough to initiate a traffic stop prior to relaying a top to another law enforcement agency." [*See id.* at 14 (citing *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981))].  The Court is confused by this argument.  Indeed, *Glover* explicitly states the opposite: "Under this Court's precedents, the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *See Glover*, 140 S. Ct. at 1187 (quoting *Cortez*, 449 U.S. at 417-18).

soon as Agent Graber spoke to the Michigan state police and informed them of the DEA's investigation, the requisite relationship was established, and the troopers could stop Defendant's minivan."). Thus, it is no constitutional error that Officer Stalcup relied on information that had been provided by state law enforcement.

In sum, the Supreme Court has stressed that a court must consider the totality of the circumstances when determining whether reasonable suspicion is present to effectuate a traffic stop. *See Navarette*, 572 U.S. at 396-97. Upon such a consideration in this case, the Court concludes that Sergeant Lark had reasonable suspicion to believe Defendant was engaged in criminal activity, namely driving under the influence.[8] *See id.* at 402; *see also Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) ("In examining the totality of the circumstances, it is important to note that the officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers.").

*Reasonable suspicion.* Defendant also argues that the Magistrate Judge erred by concluding that reasonable suspicion existed for the traffic stop and that Sergeant Lark instead "needed probable cause to initiate the traffic stop, not just reasonable articulable suspicion." [*See* R. 6, p. 9]. The Court may quickly dispose of this objection.

"In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *See Lyons*, 687 F.3d at 763. Here, Defendant was suspected of driving under the influence, which is criminal activity. *See* KRS 189A.010(5A). Thus, only reasonable suspicion was required to stop him. As discussed above,

---

[8] *Whiteley v. Warden*, 401 U.S. 560 (1971), which Defendant relies on, does not affect the outcome of this case. That case dealt with a complaint that could not support a finding of probable cause by the issuing magistrate. *See id.* at 568. In contrast, the Court finds reasonable suspicion for the stop existed in this case.

Sergeant Lark had reasonable suspicion that Defendant was driving under the influence, and that reasonable suspicion can be imputed to Officer Stalcup under the collective knowledge doctrine. Thus, Defendant's objection on this point will be overruled.

*Extension of Defendant's Stop.*   Defendant next argues that his stop was unreasonably extended.   Specifically, Defendant challenges the actions of the Fort Knox security guards (the DASGs).   [*See* R. 6, p. 18 ("In this case, the army security guards detained Fitzmaurice while waiting for officers with additional training but did not issue a citation and no testimony was obtained related to their grounds for detaining Fitzmaurice.")].   This objection also lacks merit.

Supreme Court case law is clear "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  *See Rodriguez v. United States*, 575 U.S. 348, 350 (2015).   Here, Defendant was stopped upon suspicion of driving under the influence.   The record reveals that only a few minutes elapsed from the time he was stopped by the gate security officers to the time Officer Stalcup arrived.[9] [*See* R. 2-2, p. 3 ("[Officer Stalcup] testified that he was on the far side of the installation when the call came in and that it took him approximately four minutes to reach the gate."); R. 6, p. 16 ("Here the Officers did not have enough to take Fitzmaurice into custody and his detention was clearly custodial as he was unable to leave Fort Knox, with his identification card in the possession of the DASGs while he waited 4-5 minutes for additional officers to begin an investigation."); R. 6, p. 18 (referencing records and arguing that a "six minute detention is not *de minimus* and exceeds routine measure associated with a traffic stop")].   And Defendant has not pointed to any testimony or other evidence that would support a finding that any of the law enforcement officers involved

---

[9] Defendant acknowledges that "Army Regulation 190-56, § 5-2 grants army security guards apprehension authority to issue citations and turn subjects over to appropriate civilian or military authorities."  [*See* R. 6, p. 18].

detained him for longer than was necessary to complete the mission of determining whether Defendant was driving under the influence. *See Rodriguez*, 575 U.S. at 354. To be sure, Officer Stalcup testified that this stop was not excessive in length. [*See* R. 2-3, p. 58].

Without any evidence to support a contrary finding, Defendant has failed to show that his stop was unreasonably extended.[10] Instead, on this record, Defendant cannot point to *any* unrelated investigation or inquiries that lengthened his stop. *Cf. Rodriguez*, 575 U.S. at 354 ("[T]he Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention."). Therefore, the record supports a finding that the officers involved detained Defendant only as long as needed to complete their investigation into whether he was driving under the influence. *See Tataw*, 2013 WL 6097109, at *2-3 (finding no Fourth Amendment violation when security guard at Fort Campbell waited for Military Police to arrive to conduct field sobriety tests). This objection will therefore be overruled.

*Miranda Warnings.* Finally, Defendant argues that the failure to give him *Miranda* warnings during the DUI investigation violated his constitutional rights. [*See* R. 6, p. 19 ("Therefore, any evidence obtained after he was detained and not *Mirandized* is fruit of the poisonous tree, not just the statements he made to Stalcup about getting into trouble for failing to comply with an order on base.")]. This objection fails for several reasons.

First, Defendant has not shown how the facts of this case fit within the *Miranda* framework. Importantly, the Fifth Amendment protects, relevant to this case, an individual from being "compelled in any criminal case to be a witness against himself," *see* U.S. Const. amend. V, and *Miranda* warnings are designed to ensure that this right against self-incrimination is not infringed. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("To summarize, we hold that when an

---

[10]  He has also provided no authority to suggest that the security guards' request that he move to a nearby parking lot, which violated Army policy, is a matter of constitutional significance.

individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."). A *Miranda* inquiry has two prongs: whether Defendant was in custody and whether he was subjected to questioning. *Id.*

 As observed by the Magistrate Judge, "[t]he fact that no [*Miranda*] warnings were given was undisputed at the suppression hearing." [*See* R. 2-2, p. 16]. Further, the Magistrate Judge assumed that Defendant was in custody, and the Court sees no reason to revisit that conclusion here (even on *de novo* review).[11] [*See id.* at 17 ("While the evidence here appears to establish that Fitzmaurice was in custody as of the time he was directed to park his vehicle in the parking lot adjacent to the gate . . . ."). The question, then, is whether Defendant was subjected to questioning.

Notably, "the term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Woods*, 711 F.3d 737, 740-41 (6th Cir. 2013) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)) (internal quotation marks omitted). Here, Defendant has provided no factual support for the Court to find that any of the officers, including Officer Stalcup, subjected him to custodial interrogation.

Instead, Officer Stalcup testified as follows:

When I encountered Mr. Fitzmaurice and asked him if he would step out of the vehicle to perform standardized field sobriety tests, he would say, "I don't want to get in trouble for not complying on an Army base." And I explained to him that the tests were voluntary. We went through that numerous times. I let him know over and over again that the tests were voluntary.

---

[11] Defendant represents that there is a credibility issue with Officer Stalcup's testimony regarding how many police officers were on the scene. [*See* R. 6, p. 21]. The Court finds no such concern.

[R. 2-3, p. 68].  Even Defendant simply describes Officer Stalcup as testifying as to what Defendant *told him* when Defendant was asked to perform field sobriety tests.  [*See* R. 6, p. 19 ("Officer Stalcup further testified that Mr. Fitzmaurice told him, 'I don't want to get in trouble for not complying on an Army base[.]'")].

In his briefing, Defendant does not point to any actions or statements on Officer Stalcup's part that elicited his statement.  *See Pennsylvania v. Muniz*, 496 U.S. 582, 603 (1990) ("Officer Hosterman's dialogue with Muniz concerning the physical sobriety tests consisted primarily of carefully scripted instructions as to how the tests were to be performed.  These instructions were not likely to be perceived as calling for any verbal response and therefore were not 'words or actions' constituting custodial interrogation.");  *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (finding to custodial interrogation when "a single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists"); *cf. Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").  Therefore, on this record, Defendant was not subjected to custodial interrogation.  *See Woods*, 711 F.3d at 740 ("The threshold issue is whether Woods was subjected to a custodial interrogation. In the absence of a custodial interrogation, the requirement to recite the *Miranda* warnings is not triggered and the analysis is at an end.").

One other point bears mentioning in this context: Supreme Court case law is clear that the physical aspects of Defendant's field sobriety tests are non-testimonial and thus not protected by the Fifth Amendment.  *See Muniz*, 496 U.S. at 592.  Thus, Defendant's argument that "any evidence obtained after he was detained and not *Mirandized* is fruit of the poisonous tree" is simply

without merit. [*See* R. 6, p. 19]. As with Defendant's other legal objections, Defendant's objection regarding *Miranda* will be overruled.

*Final Observation.*   Last, in his Motion to Suppress and supporting briefing, and at the evidentiary hearing, Defendant argued that an opinion by a different magistrate judge of this Court should control the outcome of this case.   *See United States v. Mormino*, Citation No. 9193389 (E.D. Ky. May 12, 2021) (United States Magistrate Judge Regina S. Edwards granting motion to dismiss in DUI case from Fort Knox and finding that the stop of the defendant there was not supported by articulable reasonable suspicion); [*see also* R. 2-9, p. 17].   As explained above, the Court must consider the totality of the circumstances of the case presently before the Court and finds *Mormino* inapposite to the situation presented here.   Indeed, that decision rested heavily upon the lack of credibility by one of the responding officers, which is not present in this case.   *Mormino* thus has no bearing on the outcome here.

## VI.   Conclusion

For the foregoing reasons, it is hereby **ORDERED** as follows:

1.   Defendant's Appeal is **DENIED;**

2.   Each of his objections are **OVERRULED**; and

3.   The Court **AFFIRMS** the Magistrate Judge's **DENIAL** of the motion to suppress.

This the 28th day of April, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY